**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AmSurg Holdings Incorporated, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Divesh Anireddy, et al., <br><br> Defendants. | No. CV-17-04181-PHX-SMB <br><br> **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

At issue is the motion for summary judgment filed by defendants Anireddy, Esker, Miller, Bryant, Endoscopy Center of Yuma, L.L.C. ("ECY"), and Yuma Endoscopy Center, L.L.C. ("YEC") (collectively, "Defendants").[1] (Doc. 62, "Mot."). Plaintiffs AmSurg Holdings, Inc. ("AmSurg"), and The Yuma AZ Endoscopy ASC, L.L.C. filed a response (Doc. 74, "Resp."), to which Defendants filed a reply (Doc. 86, "Reply"). Oral argument was held on January 9, 2019.

## I. Background

Defendant ECY is a physician entity located in Yuma, Arizona. Defendants Divesh Anireddy, M.D., and Alec Esker, M.D., are Members of ECY. AmSurg is a corporation in the business of developing, owning, and operating ambulatory surgery centers in partnership with physicians. Their dispute arises from a joint venture that began in October 2005, when AmSurg bought a 51% share of a surgery center operated by

---

[1] Defendant Digestive Diseases Center, L.L.C., was also party to the motion for summary judgment, but the parties have since stipulated to its dismissal. (Doc. 70).

ECY. (DSOF, Ex. 1). Plaintiffs allege they paid $6.5 million for their share of the surgery center. (Doc. 46 ¶ 14, "Complaint"). To operate the surgery center, AmSurg and ECY formed an LLC called The Yuma AZ Endoscopy ASC, LLC ("ASC"). (DSOF, Ex. 1). Defendant Beverly Bryant was an administrator at ASC, where defendant Seth Miller, M.D., also performed procedures before starting a competing surgery center, YEC. In their Complaint, Plaintiffs allege Defendants purposely undermined the success of the joint venture in order to operate and develop YEC. (Doc. 46, "Complaint").

AmSurg and ECY signed an operating agreement (the "Agreement") for ASC that states that the purpose of ASC is to own and operate the "Center." (DSOF, Ex. 1). The Center is defined as "the ambulatory surgery center operated by [ASC] and located in Yuma, Arizona, including the real property, or leasehold improvements, furniture, fixtures, the Equipment, books records, supplies, accounts receivable, goodwill, other intangibles and other assets used in its operation." (DSOF, Ex. 1). ECY maintained a 49% stake in the Center, and AmSurg and ECY are the only two members of ASC. (DSOF, Ex. 1).

The Agreement also includes an anti-assignment clause that, among other things, requires all members to approve another member's assignment of its membership interest to a non-party. (DSOF, Ex. 1). An assignment that is inconsistent with the Agreement "shall be void." (DSOF, Ex. 1). The Agreement is governed by Tennessee law, specifically the Tennessee Limited Liability Company Act, Tenn. Code. Ann. §§ 48-201-101 *et seq*. (DSOF, Ex. 1).

At the time of the Agreement, AmSurg Holdings, Inc. and its parent company, AmSurg Corp., were both corporations organized under Tennessee laws. (DSOF, Ex. 1). In 2014, AmSurg Holdings, Inc. ("AmSurg-Tennessee") merged into a newly-created Delaware corporation of the same name ("AmSurg-Delaware"). (DSOF ¶ 7). In 2016, AmSurg Corp. also merged into a different Delaware Corporation called New Amethyst, which then merged into Envision Healthcare Holdings, Inc., a Delaware corporation ("Envision"). (PASOF ¶ 19). The parent company was not a party to the Agreement. AmSurg-Delaware had no further mergers.

Defendants argue Plaintiffs lacking standing to sue because the mergers violate the Agreement's anti-assignment clause, thus voiding Plaintiff's interest in ASC. (Mot. at 8–17). Plaintiffs, however, characterize the merger as a "routine business decision" meant only to change AmSurg's state of domicile from Tennessee to Delaware. (Resp. at 1, 3; PASOF ¶ 8). They assert the merger did not change "AmSurg's business operations, practices, policies, officers or other personnel," (Resp. at 3; PASOF ¶ 9), and that the merger was not a traditional assignment but a transfer or assignment *by operation of law*, which is not a prohibited assignment as contemplated by the agreement. They note AmSurg-Delaware even retained the same IRS Federal Employer Identification Number after the merger. (Resp. at 3; PASOF ¶ 10). Defendants do not present any facts to dispute the assertion that the merger didn't change AmSurg's business operations, practices, policies, officers or other personnel. Defendants, for their part, say Plaintiffs hid the merger from them, (Mot. at 16), and they only "discovered" the merger after discovery began in this litigation. (DSOF ¶ 12). Plaintiffs respond by noting the merger was a public transaction filed with the Tennessee and Delaware Secretaries of State. (Resp. at 2; PASOF ¶ 7). Plaintiffs also argue that equity compels the court to reject Defendants' motion.

Defendants' motion asks for summary judgment on all causes of action alleged in the Complaint arguing that Plaintiffs have no standing to sue. (Mot. at 2).

**II.    Legal Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987). The non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a question of material fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

### III. Analysis

Defendants move for summary judgment on the grounds that the entities they contracted with, AmSurg-Tennessee and AmSurg Corp., ceased to exist when they merged into different corporations and the anti-assignment clause prevents any rights the original entities had from transferring to the new corporations AmSurg-Delaware and Envision. Therefore, Plaintiffs do not have standing to sue. For the reasons that follow, Defendants' arguments are unpersuasive.

1. <u>The ASC's anti-assignment clause</u>

The anti-assignment clause is found in Section 12 of the Agreement. Defendants argue Plaintiffs only have standing to sue if the original entities assigned their membership interest to the new entities consistent with Subsection 12.3, the portion of the Agreement that governs assignments to "any person who is not a member." (Mot. at 5). The relevant portions of the Agreement are as follows:

> **12.1. Assignment of Membership Interests.** No assignment of all or any part of a Membership Interest in the LLC (including any Financial Rights, Governance Rights or other rights pertaining to a Membership Interest) shall be made except as follows:
>
> …
>
> 12.1.2. Subject to the provisions of Section 12.3 hereof, a Member may assign such Member's Membership Interest to any person who is not a Member;
>
> …
>
> 12.1.5. The LLC need not recognize any assignment of all or any part of a Membership Interest other than an assignment described in Sections 12.1.1 through 12.1.4 hereof. Any other assignment or

> attempted assignment shall be void. No assignment shall be effective until written notice thereof has been provided to the LLC and any other applicable requirements set forth in this Agreement, the Articles of Organization or the Act have been satisfied.
>
> …
>
> **12.3. Assignment of Membership Interest with Consent of Other Members.** A Member may assign all or any part of such Member's Membership Interest to a person not theretofore a Member in accordance with Section 12. l.2 hereof if (a) the assignor first gives written notice to the other Member(s) and the LLC of the proposed assignment, giving the name, address and social security or taxpayer identification number of the proposed assignee and describing the terms of the assignment, (b) the proposed assignee executes a copy of this Agreement and agrees in writing to be bound by the terms hereof, (c) the assignment is approved in writing by the other Members, and (d) the assignment is permitted under Section 12.5 hereof. … The approval by the Members of an assignment pursuant to this Section 12.3 shall constitute consent to the continuation of the existence and the business of the LLC pursuant to the Act.
>
> …
>
> **12.5. Restrictions on Assignment.** No Member shall be permitted to assign such Member's Membership Interest, Financial Rights or Governance Rights if such assignment would result in the LLC being taxed for federal income tax purposes as an association taxable as a corporation or would constitute a violation of any applicable federal or state law. Each of the Members hereby agrees and acknowledges that the restrictions on assignment contained in this Article 12 are not unreasonable in view of the nature of the parties and their relationships to one another and the nature of the business of the LLC.

The crux of the issue is whether AmSurg-Tennessee's merger into AmSurg-Delaware is a prohibited assignment contemplated by the Agreement. Defendants contend that the merger was a "transfer by operation of law," which is barred by the Agreement and AmSurg-Delaware is nothing more than an "imposter" without a claim to any of the contractual rights previously possessed by AmSurg-Tennessee. (Mot. at 10–11) (quoting *Freeman Mgmt. Corp. v. Shurgard Storage Centers, Inc.*, No. 3:06cvo736, 2007 WL 1541877, at 4* (M.D. Tenn. May 23, 2007)). Plaintiffs agree the merger is "an assignment by operation of law" or a "transfer by operation of law," but argue an assignment by operation of law is a legal term of art that is fundamentally different than an assignment as contemplated by the Agreement. (Resp. at 4–9). *See also* Tenn. Code Ann. § 48-244-

104(c)(1), (2) (The effect of a merger is that every entity "other than the surviving entity ceases to exist," and "all property . . . owned by each of the merged entities vests in the surviving or resulting entity.")

2. <u>Tennessee statutes do not provide a definitive answer.</u>

AmSurg-Tennessee, AmSurg-Delaware, AmSurg Corp, New Amethyst, and Envision are all corporations. Mergers of for-profit business corporations are governed by Tenn. Code. Ann § 48-21-108. It provides that when a merger is effective, "The Corporation or eligible entity that is designated in the plan of merger as an entity surviving the merger shall survive, and the separate existence of every other corporation or eligible entity that is a party to the merger *shall cease*." Tenn. Code Ann. § 48-21-108(a)(1) (emphasis added). Further, "All property owned by, and every contract right possessed by, each corporation or eligible entity that is merged into the survivor shall be vested in the survivor without revision or impairment." *Id.* at § 48-21-108(a)(2). Therefore, when AmSurg-Tennessee merged into AmSurg-Delaware, AmSurg-Tennessee ceased and all property owned by it "vested in" AmSurg-Delaware "without reversion or impairment." The same goes for AmSurg Corp.'s merger into New Amethyst and then Envision.

Defendants argue that the party they originally did business with has ceased to exist and the "vesting" of AmSurg-Tennessee's interest in the ASC into AmSurg-Delaware is an assignment in violation of Tenn. Code. Ann. § 48-218-102, which sets the default rules for assignment of membership interests in Limited Liability Companies. Section 48-218-102(b)(2)(A) governs an assignment to a non-member:

> Except as provided in subdivisions (b)(2)(B) and (C), any other assignment of any governance rights is effective only if all the members, other than the member seeking to make the assignment, approve the assignment by unanimous consent or if the articles or operating agreement so permit, the assignment is approved in accordance with, if the assignment is approved in accordance with § 48-232-102.[2]

---

[2] Section 48-232-102 governs the admission of new members to a Limited Liability Company.

- 6 -

Subsection f provides the outcome of an assignment that is not consistent with the statute:

> (f) CONSEQUENCES OF INEFFECTIVE ASSIGNMENT. If any purported or attempted assignment of governance rights is ineffective for failure to obtain the consent required in subsection (b):
> (1) The purported or attempted assignment is ineffective in its entirety; and
> (2) Any assignment of financial rights that accompanied the purported or attempted assignment of governance rights is void.

What is conspicuously absent from the statutes cited by Defendants is whether the statute that vested AmSurg-Tennessee's property into AmSurg-Delaware when those corporations merged is an "assignment."[3] Additionally, subsection (b)(1) of the same statute the defendants cited allows parties to contract around the default rules. Tenn. Code. Ann. § 48-218-102(b)(1). And, as previously noted, Plaintiffs concede that courts have interpreted a merger to be an assignment by operation of law or a transfer, but they argue the Agreement should be interpreted as unambiguously allowing a merger because it is a legal term of art, categorically different than the generic "assignment" used in the Agreement. That is, the Agreement was never intended to prevent assignments by operation of law. Defendants argue otherwise, pointing to case law that has barred transfers of property after a merger.

3. <u>Case law does not provide a definitive answer.</u>

Defendants argue that a merger is a "transfer by operation of law," *Freeman*, 2007 WL 1541877 at *4, which constitutes an assignment. In their view of the Agreement, if the parties meant to exclude transfers by operation of law from the broader prohibition on assignments, the Agreement would have explicitly stated so. *See PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1095 (6th Cir. 1979) ("If the parties had intended an exception [to the anti-assignment clause] in the event of a merger, it would have been a simple matter to have so provided in the agreement."). In support of this interpretation,

---

[3] Additionally, Section 48-21-108(b) provides that property and contract rights owned by a ceasing entity is vested in the surviving corporation without reversion or impairment. It is hard to imagine a more significant impairment of the rights owned by the ceasing entity in this case, AmSurg-Tennessee, than the remedy requested by Defendants.

- 7 -

Defendants largely rely on *PPG Industries*, *Freeman*, *L & L Trucking, Inc. v. Hewlett*, Nos. 01-A-01-9105-BC00159, 1992 WL 69635 (Tenn. Ct. App. 1992), and *Mapco Petroleum, Inc. v. Basden*, 774 S.W.2d 598 (Tenn. 1989).

In all four cases a transfer of property was barred after a merger, but Defendants overstate the applicability of those cases to this one. The facts of the cases are distinguishable, as is the legal reasoning that animates them. In *Mapco*, the Tennessee Supreme Court held that a permit to sell beer did not pass to a succeeding corporation by merger. 774 S.W.2d at 660. The Court noted that it had previously held that a permit is not assignable even when a purchaser buys a location that previously held a valid permit, and that the purpose of the beer permitting statute was to "evaluate the qualifications and the moral character" of the person or entity seeking a permit. *Id.* at 599–600. Therefore, a surviving entity must apply for a new permit to sell beer. *Id.* at 600. *L & L Trucking* presents a similar problem for Defendants. There, a trucking company sought to transfer a certificate of convenience and necessity that had been abandoned by its previous holder through a merger. *L & L Trucking*, 1992 WL 69635, at *4. The court held that there was no reversion or impairment of the previous entity's rights because of the abandonment, and the transfer by merger would have been subject to a state law that prohibited transfers of such certificates without review by a state regulator. *Id.* Here, there is no overarching public safety or regulatory scheme preventing AmSurg-Tennessee's interest from being assignable to the successor entity. In fact, Tennessee State law specifically allows parties to contract around the default rules for assignments of membership interest. Tenn. Code. Ann. § 48-218-102(b)(1).

Defendants' reliance on *Freeman* is also misplaced. There, the agreement at issue contained an anti-assignment clause that specifically forbade assignments by operation of law. *Freeman*, 2007 WL 1541877 at *2, 5. The agreement forbade an assignment "voluntarily or by operation of law (herein sometimes collectively called a 'transfer')." *Id.* at *2. Additionally, in that case, allowing the merger would have resulted in a competitor becoming partners with the plaintiff, thus "forcing the [plaintiffs] to accept as a partner a

- 8 -

person with which they did not consent to become partners." *Id.* at \*8. Here, the Agreement lacks the specificity of the *Freeman* agreement, as it does not explicitly forbid assignments by operation of law or even the more generic term "transfer." Furthermore, believing Plaintiffs' statement that AmSurg's "operations, practices, policies, officers, or other personnel" remained unchanged after the merger, which the Court is required to do at this stage, avoids the *Freeman* court's concerns about forcing Defendants into an agreement with a stranger.

*PPG Industries* is also distinguishable. There, the 6th Circuit considered whether a patent license is transferable in a merger when the anti-assignment clause stated it was "non-transferrable" and "personal" to the licensee. *PPG Ind.*, 597 F.2d at 1092. They held the anti-assignment clause prevented assignment by operation of law because, "if the parties had intended an exception" to the anti-assignment clause in the case of a merger, "they would have included it in the agreement." *Id.* at 1095. Again, this is factually distinct from the case at bar, which uses "assignment" without such specificity. Furthermore, *PPG Industries* was not interpreting Tennessee law, and other courts have declined to follow *PPG Industries* on the grounds that it is too "mechanical[]." *Star Cellular Telephone Co., Inc. v. Baton Rouge CGSA, Inc.*, Civ. A. No. 12507, 1993 WL 294847, at \*6 (Del. Ch. Aug. 2, 1993). Delaware cases, such as *Star Cellular*, are particularly persuasive on issues of corporate law. *Athlon Sports Comm., Inc. v. Duggan*, 549 S.W.3d 107, 125 (Tenn. 2018) ("[I]n matters of corporate law, Tennessee courts often look to Delaware law."). Therefore, while it is certainly possible that the anti-assignment clause prohibits transfers by merger, it is not plain and unambiguous from case law.

Plaintiffs rely on *Star Cellular* as the leading case. *Star Cellular* interpreted a very similar anti-assignment clause. It provided that a "General Partner may transfer or assign its General Partner's Interest only after written notice to all the other Partners and the unanimous vote of all the other Partners to permit such transfer . . . ." 1993 WL 294847 at \*3. *Star Cellular* acknowledged that some courts, in interpreting anti-assignment clauses, treat transfers that occur "by express voluntary act" differently than "those that occur by

operation of law." *Id.* at *6. The court saw that "existing uncertainty" as proof that the word "transfer" did not have a "generally prevailing" meaning at the time of the contract. *Id.* at *7. While the plaintiffs in *Star Cellular* urged the "broadest possible construction" of "transfer," *id.* at *4, the court held that the uncertainty in the law when the agreement was drafted prevented it from holding that a transfer by operation of law was a type of transfer prohibited by the anti-assignment clause. *Id.* at *7. Furthermore, the parties easily could have provided language addressing mergers or transfers by operation of law. *Id.* By failing to do so, it was "not plain[] and unambiguous[]" that mergers were included "within the category of prohibited 'transfers.'" *Id. Star Cellular* also explains the rationale behind anti-assignment clauses: they "are normally included in contracts to prevent the introduction of a stranger into the contracting parties' relationship and to assure performance by the original contracting parties." 1993 WL 294847 at *8.

Similar to *Star Cellular*, Defendants here have not pointed to Tennessee authority clearly establishing a merger that changes nothing but the domicile of an entity by operation of law is a type of assignment "plainly and unambiguously" prohibited by a generic anti-assignment clause. If the parties wanted to plainly and unambiguously prohibit assignments by operation of law, they could have done so like the parties in *Freeman* did. Unfortunately, Plaintiffs and Defendants, like the parties in *Star Cellular*, did not include language addressing what would happen if a member transferred its interest by operation of law. Therefore, the Court is unable to determine a clear intent with regard to whether the anti-assignment clause applies to transfers by operation of law. Accordingly, both Plaintiffs' and Defendants' readings of the anti-assignment clause are a *reasonable* interpretation of it, and, therefore, the clause is ambiguous.

4. <u>The ambiguity precludes summary judgment because it is a material issue of fact.</u>

In interpreting contracts, a court's goal "is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009). To determine the parties' intent, a court first looks "at the plain meaning of the words in a contract." *Id.* If the plain meaning is unambiguous, the inquiry ends and that meaning is applied. *Id.* If,

however, the "words are ambiguous, i.e., susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language." *Id.* When a contract's language is ambiguous, the court applies "established rules of construction to determine the intent of the parties." *Id.* (quoting *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)).

Here, both Defendants and Plaintiffs have reasonable interpretations of the clause. Under Defendants' theory "assignment" is given a broad reading, essentially including any transfer of interest. The clause, however, does not mention mergers or even use the word "transfer," and the statute explaining the effect of a merger refers to property "vest[ing]" in the new entity rather than the former entity transferring or assigning property to the surviving entity. Nevertheless, contracting parties are "presumed to know the law," *Dick Broadcasting Co., Inc. v. Oak ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013), and case law refers to mergers as "transfer[s] by operation of law," *see, e.g.*, *PPG Industries,* 597 F.32d 1090; *Star Cellular*, 1993 WL 294847, and "assignment[s] by operation of law," *Subcontracting concepts, LLC v. Creative Ins. Managers, Inc.*, Civil Action File No. 1:13-CV-02973-HLM, 2014 WL 12013431, at *2 (N.D. Ga. Jan. 3, 2014) (collecting Delaware cases).

Because the Agreement is ambiguous, the Court looks to extrinsic evidence to determine the intent of the parties. *Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton*, 393 S.W.3d 671, 676 (Tenn. App. 2012). If ambiguity with regard to a material fact continues to exist after considering extrinsic evidence, it is a genuine issue of fact precluding summary judgment. *Id.* "[P]arol evidence 'regarding the relations existing between the parties, the facts surrounding them at the time when they entered into the agreement, and also their acts subsequent thereto' may be considered by the court when interpreting an ambiguous contractual provision." *Dog House Investments, LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 913 (Tenn. Ct. App. 2014) (quoting *Faulkner v. Ramsey*, 158 S.W.2d 710, 711 (1942)).

The Parties have provided little information with regard to what *Dog House* directs

courts to consider when ambiguities in contracts are found. Defendants have not shown how AmSurg-Tennessee merging into AmSurg-Delaware has harmed them, though they allege that doing business with AmSurg-Tennessee was a "material inducement" because of "its assurances of the services it could provide, the people behind the corporation, and the overall business model," and the merger "destroyed the original intent of doing business with the exact corporation and people that originally convinced us and ECY to go into business with them to form the ASC." (Affidavits of Divesh R. Anireddy, M.D., Doc. 64 ¶ 13, and Alec H. Esker, M.D., Doc.65 ¶ 13). Plaintiffs counter that the merger "did not affect business operations, practices, policies, or other personnel." (Declaration of Justin Page, Doc. 75, Ex. A). While perhaps more information regarding the relations between the parties and the facts surround the agreement may exist to resolve the ambiguity, at this point in the litigation, the Court does not have enough information to reach a conclusion and, at a minimum, this creates a factual dispute that precludes summary judgment.

5. <u>Equitable principles also compel denial of Defendants' motion.</u>

The Tennessee Limited Liability company Act invites courts to apply equitable principles when enforcing an LLC operating agreement. Tenn. Code Ann. § 48-206-102(c) ("A court of equity may enforce an operating agreement by injunction or by such other equitable relief as the court in its discretion determines to be fair and appropriate in the circumstances."). To be sure, the merger of AmSurg-Tennessee into AmSurg-Delaware resulted in a different legal entity owning the member interest in ASC, but this technical change does not overwhelm the substance of the Agreement.

"[E]quity looks not to the outward form but to the inward substance of every transaction." *Halco Fin. Servs., Inc. v. Foster*, 770 S.W.2d 554, 556 (Tenn. App. 1989) (quoting *Bond v. Jackson*, 4 Tenn. 189, 189 (1817). Here, the substance was a $6.5 million investment in an ambulatory surgery center in exchange for a 51% share in it. A simple formal change in domicile by AmSurg accomplished through a merger without Defendant providing any evidence of damages from the merger cannot equitably result in Plaintiffs forfeiting their interest in ASC. Therefore, Plaintiffs have standing to sue.

6. <u>ASC is a proper plaintiff.</u>

Defendants contend that the ASC is not a proper plaintiff because AmSurg-Delaware is an imposter without standing after the merger. As discussed above, the Court is not persuaded that the merger resulted in AmSurg-Delaware forfeiting AmSurg-Tennessee's 51% interest in ASC. Accordingly, AmSurg-Delaware still has a controlling stake in ASC, and ASC is a proper plaintiff.

**IV. Conclusion**

Defendants seek summary judgment on all counts on the grounds that the merger of AmSurg-Tennessee into AmSurg-Delaware was an assignment prohibited by the Agreement that deprived Plaintiffs standing to bring suit. Because it is ambiguous whether a transfer by operation of law is forbidden by the Agreement and there is a dispute of material facts, Defendants' motion must be denied.

Accordingly, **IT IS ORDERED** that:

1. The motion for summary judgment by Defendants is **DENIED**.

Dated this 29th day of January, 2019.

_____
Honorable Susan M. Brnovich
United States District Judge